Commonwealth v. Gallagher

*George P. Williams, 3rd,* and *John C. Phillips,* Deputy Attorney General, for Commonwealth.

*James F. Masterson,* for defendant.

GORDON, JR., P. J., September 13, 1949.—Defendant, Fire Marshal of the City of Philadelphia, is charged in the bill of indictment in this case with extortion as a public officer under section 318 of The Penal Code of June 24, 1939, P. L. 872. The bill contains 12 counts, charging separate and distinct offenses, and the jury acquitted defendant, under the direction of the court, on the eighth, ninth, and eleventh counts, and found him guilty in the remaining nine counts. The issue in each count was simple, and the proofs presented by the Commonwealth consisted primarily of testimony by certain business men that they had paid to defendant various sums of money as a "fee or reward" for his official approval of their applications for licenses, or "permits", to install tanks and equipment for the storing and use of high explosives, such as gasolines and oils, at different locations in the city. The defense was a broad and sweeping denial, in various forms, that defendant had been offered, demanded, accepted or received any money whatever from the prosecuting witnesses. They knew defendant only in their official dealings with him, and hence, they would have no reason for giving him money, except as a payment, or "tip", for approving their applications. Upon the issue thus joined the case went to the jury with the result stated above.

After motions for a new trial and in arrest of judgment were dismissed by the court and judgment of sentence entered upon the verdict, defendant appealed to the Superior Court, and this memorandum opinion is filed under rule 58 of its rules.

We did not receive notice from counsel for defendant of the questions intended to be raised on the appeal

until September 1, 1949. They are 11 in number and will be discussed seriatim. The first and second questions go to the motion in arrest of judgment, and are:

"1. Can a conviction be had on an indictment which, by reason of a deleting amendment offered on behalf of the Commonwealth, fails to charge, in accordance with the requirement of article 5, sec. 23 of the Constitution of Pennsylvania, that the offense was committed 'against the peace and dignity of the Commonwealth of Pennsylvania'?

"2. Is the Fire Marshal of the City of Philadelphia, an employe of the municipality, a position subordinate to the Director of Public Safety of the City of Philadelphia, a public officer within the meaning of section 318 of the Act of June 24, 1939, 18 PS §4318 (Extortion Statute)?"

The first of these questions is substantially covered by our opinion in the case of Commonwealth v. Hopkins, 70 D. & C. 166, which is filed contemporaneously with this opinion, and reference is made to it for the views therein expressed upon the question we are now considering. There are a few factual differences between the two cases, however, which merit attention. In the Hopkins case defendant did not ask leave to amend the indictment until after he had pleaded and the trial had started. Here, however, the defendant made two motions to quash before plea, the first while the bill was in its original and unexceptional form, and the second, at bar, after the Commonwealth had been given leave to amend the bill, and when he was arraigned for plea.

When the first motion to quash was argued, we allowed the Attorney General to amend the indictment by striking out the concluding words "against the peace and dignity of the Commonwealth of Pennsylvania". This was done on Friday, April 22nd and the trial began on the following Monday, April 25th. When

the case was called on that day, defendant again moved to quash the indictment without assigning any additional reason for doing so. His counsel did not even suggest at that time that the amendment had given him another and perhaps valid cause for moving to quash. Although it does not appear in the record, we state that what he actually said at that time was that he supposed the court would not wish an argument which would be only a repetition of what he had said in support of his previous motion to quash. In this way he lulled us into thinking he had no additional question to raise, and silently permitted us to dismiss his new motion to quash. Defendant was then called to the bar to plead, and on the advice of counsel stood mute, and a plea of not guilty was entered for him by the court, under the Act of March 31, 1860, P. L. 427, sec. 26, which provides that, if an accused stands mute, the court shall enter a plea for him and the trial shall proceed in the same manner as if the accused had actually pleaded. Section 11 of the same act requires objections to an indictment for any formal defect to be taken by demurrer or motion to quash before the jury is sworn. The effect of these two sections of the Act of 1860 was to render the plea entered for defendant by the court equivalent to a plea by defendant himself, and by so doing, the formal defect in the conclusion of the indictment was clearly waived.

It is plain that defendant was attempting, by refraining from candidly calling the provision of article V, sec. 23 of the Constitution to the court's attention, to prevent the immediate restoration by amendment of the prescribed formal conclusion, which undoubtedly could have been done, and thereby to risk an adverse verdict which he believed he could subsequently overturn by a motion in arrest of judgment. Guileful tactics may sometimes be successful, but they were rendered abortive by section 11 of the Act of March 31,

1860, P. L. 427, the purpose of which is to prevent the very kind of maneuvering that was attempted here. Defendant's standing mute cannot help him to avoid his obvious intent to circumvent the language and the spirit of the act. In addition, the effect of his failure to fairly raise the constitutional question before pleading is apart from the question of the amendability of a pleading at any time before final judgment, which is discussed in the Hopkins case: See also, Commonwealth v. Syren et al., 150 Pa. Superior Ct. 32; Commonwealth v. Tassone, 246 Pa. 543; Brown et al v. The Commonwealth, 78 Pa. 122. The first reason for arresting the judgment being without merit, in our opinion, the motion based on it was dismissed.

The second question raised on the motion to quash is that the office of fire marshal is not a public office within the meaning of section 318 of The Penal Code of June 24, 1939, supra. This turns upon what legally constitutes an office. Section 12 of the Criminal Code of March 31, 1860, P. L. 382, of which section 318 of the 1939 Code is a continuation, used the language "Officer of the Commonwealth", and in this way limited its operation to State officers. This is illustrated by the case of Commonwealth v. Norris, 87 Pa. Superior Ct. 61, which was decided under the earlier code, and which held that the Chief of Police of the Borough of Emporium was not an officer of the Commonwealth, and hence could not be convicted of extortion under it. The legislature, however, eliminated those words in adopting the 1939 Code, and substituted for them the present words, "public officer". In this way it widened the scope of the offense by embracing within it every public servant whose position rises to the dignity of an office, regardless of whether it is under a State or local branch of the government.

The decisions as to what constitutes a public office are innumerable and somewhat confusing, for they lay

down almost as many different tests of an office as there are reported cases. Reading through the cases, however, we think they can be reconciled upon the basis of the fundamental nature of the functions of the particular position in the public service under consideration. If it is not wholly subordinate and administrative, but highly discretionary and governmental in character, it is clearly a public office, whether it exists within the structure of the State or of a local branch of government. Tested in this light, there can be no doubt that the office of fire marshal rises to the dignity of a public office. The marshal has many arbitrary and discretionary powers. He is appointed subject to confirmation by city council. He has the broadest kind of investigatory powers and duties; he can enter and inspect places at will for purposes of discovering violations of safety laws and the existence of potential fire hazards, conduct investigations, summon witnesses, administer oaths, make arrests, and do all things necessary to protect the public from the dangers of fire. See sections 5 to 9 of the Fire Marshal's Act of June 8, 1911, P. L. 705, and its amendments. These are only a few of his duties. In the matter before us he is clothed with the quasi-judicial duty of approving plans and proposals for the installation of high explosive equipment within the city limits. All of these functions squarely place the office of fire marshal above the ordinary position of a mere administrative clerk or employe. The discovery of, and protection of the people of a great city from, the risks of fire have always been considered to be among the highest of governmental functions. These duties the fire marshal performs daily, and to contend that he is not a public officer, is to deny the manifest logic of facts. The trial judge did not, therefore, err when he so ruled in the present case.

The remaining nine questions which counsel has advised us would be argued on the appeal relate to various rulings, during the course of the trial, on the admission of evidence and questions of law, and go to our refusal of the motion for a new trial. The questions are stated in such a general and abstract form, without reference to specific parts of the testimony, or the names of witnesses involved, that it is difficult to determine exactly what exceptions taken during the trial they are intended to cover. We shall deal with them, therefore, in the light of the rulings to which we believe they are intended to apply. The third question reads:

"3. May a witness who has testified that he paid money to defendant testify as to the purpose for which he made the payment in the absence of any evidence showing that the purpose had been communicated to or was in any manner made known to defendant?"

The difficulty with this statement lies in the assertion that there was a complete absence of any evidence showing that the purpose for which the payment was made had been communicated, or was in any manner made known, to defendant. It relates, no doubt, to the testimony of Frank A. D'Lauro, a witness for the Commonwealth on the first count in the bill. Mr. D'Lauro testified that, desiring to secure a permit for the installation of a gasoline tank, he went to defendant's office with the application and blue print, and saw him personally and alone. He said that he was asked by defendant whether he was familiar with the procedure of the fire marshal's office; he replied that he was, and took $25 from his pocket and started to hand it to Gallagher, who "in turn handed me (D'Lauro) an envelope, and I put the $25 in the envelope and handed it back to him". D'Lauro also said that he left the office, after further conversation of a general character with the fire marshal, with the plans

approved. It was at this point that the witness was asked for what purpose he gave the money to defendant, to which he replied, "That was to take care of the one cent a gallon charge that the office was making for these installations". Later, another witness, who was familiar with the procedure for procuring permits from the mayor's office, testified that the application approved by the fire marshal's office is retained in the office of the mayor, that a bill for the permit fee is given to the applicant, and that it, when receipted by the city treasurer, constitutes the permit and is kept by the applicant. D'Lauro's application, which was retained by the mayor's office, contained the notation "O.K. F.M." made by the clerk who handled the matter in that office. The actual approval by the fire marshal is on an "approval slip", which is left with the application in the mayor's office, and the approval slip in the instant case was not produced, having apparently been lost or mislaid. It is true, therefore, that defendant's personal signature was not on the application itself, and Mr. D'Lauro had testified that he did not remember actually seeeing the fire marshal approve the application. Nevertheless, all these circumstances, as testified to by the witnesses for the Commonwealth, were ample to justify the jury in finding that the application was in fact approved by the fire marshal, that he received the money in the manner testified to by D'Lauro, and that defendant received it for his official approval of the application. We saw no merit, therefore, in the reason advanced for a new trial that is the basis of the third question to be raised on the appeal.

The fourth question is stated by counsel as follows:

"4. May a trial judge submit to the jury for its consideration an application as evidence, where the evidence fails to disclose that defendant had ever had

anything to do with the application or had ever seen it?"

This question apparently is raised in connection with the application for the installation of an oil burner, known as the "Amoco burner", and sold by the American Oil Company. It appeared that with respect to applications for the installation of oil burners in private houses, it was not necessary for the applicant to go in each instance to defendant's office and secure a specific approval. The procedure in such cases was that the fire marshal filed with the mayor's office a blanket list of approved burners, and a person desiring to install a burner would merely present his application to the mayor's office, which would issue the permit, upon checking with the list furnished it by the fire marshal in order to determine whether the particular type of burner had been approved. This list of approved burners was amended from time to time upon notice from the fire marshal to add or strike off particular types of burners. Since the Amoco burner was not on the list at the time, the witness Reamer testified that he called upon the fire marshal in order to secure his approval of the burner, and have it added to the approved list in the mayor's office. Mr. Reamer testified that he showed the fire marshal that the burner had been approved by the underwriters, and "asked him if the burner would be approved and he said he didn't have time at that time to look at the plans. He looked the plans over and the specifications and he took them and put them in a filing cabinet". Reamer further testified that he then "shook hands with Mr. Gallagher and gave him $50". The transfer of the money was accomplished by Reamer having $50 in his hand at the time he shook hands with the defendant, and leaving the $50 in defendant's hand. This evidence, in our judgment, was ample to take the case on this count to the jury. The manner in which the fire

marshal gave the mayor's office his blanket approval of burners, coupled with the appearance of the Amoco burner on the approved list after Reamer passed the $50 to defendant, rendered it immaterial whether, as stated in the fourth question, defendant "had ever had anything to do with the application or had ever seen it", and justified, we think, our refusal to grant a new trial on the ground of error in submitting the count covered by Reamer's testimony to the jury.

The fifth question to be raised on the appeal is:

"5. May a trial judge comment on the prior statements of a witness who is under cross-examination, by characterizing the statements as being consistent with the present statements and thereby deprive the jury of its right to determine questions of fact?"

During the cross-examination of a witness for the Commonwealth, counsel attempted to read testimony given by him at defendant's preliminary hearing for the alleged purpose of showing previous contradictory statements. He began by reading questions which were not contradictory at all, and was cautioned by the court that, while he had a right to confront the witness with previous contradictory statements, he had no right to merely read testimony that was not contradictory. Counsel then proceeded to read a question and answer that, standing alone, and divorced from other answers the witness had given on the same subject, disclosed an apparent conflict between his present and his previous testimony as to the date of a particular occurrence. Had all his previous testimony been read, it would have been manifest that the witness had afterwards corrected his testimony, and that his present and previous testimony were not actually contradictory. The court then observed that it was obvious that the previous testimony was not contradictory, and again cautioned counsel to confine his reading of previous testimony to substantial contradictions. It is

this statement of the court that is apparently the subject of the fifth reason to be argued on the appeal. We think a complete reading of all the examination in this connection will make it evident that the attempt of counsel to take advantage of what was a mere temporary confusion of the witness in previous testimony and not a real contradiction, was properly subject to the comment made by the court, and well within the power of a trial judge to prevent the jury from being misled by such confusing tactics.

The sixth question to be raised on appeal is stated by counsel to be:

"6. May defendant cross-examine a witness for the Commonwealth concerning prior convictions of the witness on false weight and short weight charges for the purpose of attacking the credibility of the witness?"

The prior convictions referred to in this statement were not in our judgment of such a character as to make it error for the court not to permit the question to be asked as disclosing moral turpitude on the part of the witness. They were mere mala prohibita, and fell within the power of the court to permit or exclude in its discretion. Hence, we saw no reason for granting a retrial on this ground.

The seventh question to be raised on the appeal is:

"7. May the Commonwealth elicit substantive testimony from a witness it has previously cross-examined as untrustworthy, and can the subsequent testimony sustain a conviction?"

This apparently relates to a ruling during testimony of the witness, Albert Masciantonio. At the beginning of his testimony he gave evidence which contradicted previous testimony given by him, and which the Commonwealth very properly believed to be either deliberately hostile, or due to an error of recollection. The Attorney General, therefore, pleaded surprise and

asked leave to cross-examine his witness. The purpose of doing so was, of course, primarily to clear up the testimony and refresh his recollection, and, when this was done, the witness's testimony was straightened out and he was allowed to go on and testify. Subsequently he was recalled to the stand on another point, and it was upon his recall that the objection was made which is the basis of the question as stated by counsel. When an incident such as this occurs in the trial of a case, the purpose of the cross-examination is to confront the witness with the previous contradictory testimony and give him an opportunity, either to deny having given such testimony, reaffirm it, or correct and modify the testimony then being given. Whether such contradiction destroyed his credibility was entirely for the jury, and if calling his attention to his previous testimony causes him to modify the testimony just given, the court has no power to strike it out, or instruct the jury to ignore it altogether. The present veracity of the witness goes to the jury in the light of all the questions and answers, and it is an incorrect statement of the law to say that the showing of a previous contradictory statement necessarily destroys the testimony of the witness given at the trial itself and prevents it being accepted and believed by the jury, and made the basis of a conviction. If this were not the rule, a confused witness's testimony could never be straightened out, and the truth could always be suppressed upon a bare showing of a contradiction. By the same token, he can subsequently be recalled upon a subject not covered by his previous examination, notwithstanding his having been cross-examined by the party calling him. His credibility is still for the jury, and the right to permit a witness to be recalled for further testimony is within the sound discretion of the Court, which we do not think was abused in this instance.

The eighth question to be raised by the appeal is thus stated by counsel:

"8. Is a charge under a statute complete and sufficient to sustain a conviction where the trial judge fails to define the ingredients of the criminal offense by failing to define the statutory terms 'wilfully and fraudulently'?"

Although the trial judge did not specifically define the words "wilfully" and "fraudulently" as used in the statute in explaining the nature and character of the offense of extortion by a public officer, he did explain the nature of the offense in great detail to the jury, and we think adequately and correctly for the purposes of a fair trial of the single factual issue in the case and the sharply contradictory testimony offered under it. Had counsel wished a specific charge upon those words, he should have submitted a point upon that subject, or called the omission to the attention of the court and asked for an elaboration of the charge before the jury retired to deliberate. He did neither, however, and in no way intimated that the crime had not been satisfactorily described to the jury. In these circumstances, we saw no reason for granting a new trial upon this ground: Commonwealth v. Buoy, 128 Pa. Superior Ct. 264.

The ninth question intended to be raised on appeal is adequately covered, we think, by what we have already said upon the fourth question to be raised by counsel, and needs no further comment at this time.

The tenth question reads:

"10. Are witnesses for the Commonwealth who testify that they paid for obtaining approvals guilty of crimes arising out of the same act or transaction which are the basis of charges against defendant accomplices within the meaning of the law requiring a trial judge to charge on credibility of accomplices?"

The subject matter of this question has been discussed in our opinion in the Hopkins case, in which we point out that the witnesses for the Commonwealth were not accomplices of defendant in the crime of extortion committed by him. We, therefore, think it unnecessary to discuss the question again at this time, and will content ourselves with referring to the discussion of it in the Hopkins opinion.

The eleventh and last question intended to be raised by counsel on the appeal is stated as follows:

"11. May a witness testifying for the Commonwealth against defendant who is charged with the substantive offense of extortion, testify as to conversations the witness had with other persons in the absence of defendant?"

This relates apparently to the testimony of Edward J. Slabek, who is in the retail coal and fuel oil business, and who desired to install a 40,000 gallon tank on the premises of his company at Cedar Street, east of Tioga Street, in the city of Philadelphia. Mr. Slabek testified that he had some difficulty in getting one Frank Gettis, an acting assistant fire marshal, who had charge of the district in which Slabek's property was located, to approve the installation, that he met Gettis on the ground and that Gettis had demanded payment of $400 for the approval of the fire marshal's office. Slabek protested the amount demanded, and finally Gettis told him that the money had to be divided with "higher ups", that he was willing to forego the amount he would get, and would be satisfied with $250—impliedly for the "higher ups". It was the admission of this conversation in the absence of defendant that is the subject matter of the eleventh question to be argued. Were that the only testimony upon the subject of the twelfth count of the bill of indictment, it would not, of course, have been admissible, and would have been insufficient to sustain a conviction.

Slabek testified, however, that, after that conversation, he went to see defendant himself, and told him that he had been "having difficulty in getting a permit for my tank from the inspector in my neighborhood". Slabek then testified: "In the course of our conversation, your honor, Mr. Gallagher asked me if I saw Inspector Gettis, and I said, I did, and I couldn't get a permit from him; then Fire Marshal Gallagher said, 'Why don't you talk turkey to him'?" To this Slabek testified he replied "I did talk turkey to him and he was talking too much turkey". Slabek was then asked, "What happened after that?", to which he replied, "Then Mr. Gallagher took a piece of paper from his desk, and he wrote the sum of '$400' and he turned his head away from me and turned the paper to me and he said, 'Is this what he wants?' "

"Q. What reply did you make after that was done? A. I said 'no' that Mr. Gettis wanted $250. Then Mr. Gallagher said 'you are getting a bargain. You better pay it'."

Slabek then left the office and later paid $250 to Gettis, after which the application for the permit was approved by Gettis and the fire marshal and the permit was issued to Slabek. The mere recital of this testimony amply justifies the admission of Slabek's conversation with Gettis. The whole story of the transaction linked Gallagher and Gettis together in the extortion of the money from Slabek. What Gettis said was said in furtherance of a common criminal enterprise.

In addition, it was communicated to defendant, who affirmed it by the conversation we have just quoted from the notes of testimony. It was admissible evidence, therefore, not only because it was a declaration of a co-conspirator in the course of a conspiracy and in furtherance of it, but also because it was communicated to, and tacitly endorsed by, defendant's words and actions, when he advised Slabek that he was getting a

"bargain" and he had "better pay it": Commonwealth v. Sheaffer, 149 Pa. Superior Ct. 51; Commonwealth v. Bitler, 133 Pa. Superior Ct. 268. The circumstances testified to are also sufficient to sustain the inference that defendant ultimately received the $250 paid by Slabek to Gettis for official approval of the application.

The case against defendant on all of the counts on which the jury found him guilty was overwhelmingly proved, went to the jury after a trial and charge which we think were free from substantial error, and it was for the foregoing reasons that we dismissed the motion in arrest of judgment and discharged the rule for a new trial.